*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LEWIS HENRY MCCLAINE, also known as
LEWIS HENRY MCCLAINE-BEY,

Defendant-Appellant.

UNPUBLISHED
June 22, 2023

No. 358549
Wayne Circuit Court
LC No. 88-000054-01-FC

Before: MARKEY, P.J., and JANSEN and K. F. KELLY, JJ.

PER CURIAM.

Defendant was originally charged with first-degree murder, both premeditated and felony murder, MCL 750.316, along with possession of a firearm during the commission of a felony, MCL 750.227b ("felony-firearm"). The felony-firearm charge was dismissed and the first-degree murder count was reduced to second-degree murder, MCL 750.317, in response to defendant's motion to quash his bindover. In August 1988, defendant was convicted by a jury of second-degree murder, and he was sentenced one month later to a prison term of 200 to 400 years. Due to a series of errors, defendant has not been afforded an appeal as of right until after his judgment of sentence was reissued on August 26, 2021. Accordingly, defendant now appeals as of right from the reissued judgment of sentence. We affirm defendant's conviction, but vacate his sentence and remand for resentencing.

## I. BACKGROUND

On December 8, 1987, Allen Morris was stabbed to death in Detroit shortly after he arrived at a house that defendant had been renting for two or three weeks. Debra Jones Kurt ("Jones Kurt"), who arrived with Morris, was also at the house. Morris rented a room in the house and defendant testified that Morris used the house to entertain female companions, although he was married. Defendant and Morris went upstairs to talk, while Jones Kurt waited in a bedroom on the main floor.

Jones Kurt heard an argument and Morris was upset when he returned downstairs. The argument continued after Morris went back upstairs. Jones Kurt heard a sound like tumbling down

-1-

the stairs and she saw defendant and Morris coming down the stairs. Defendant had a large gun in his hand and he was on top of Morris. She heard defendant tell Morris that he was going to kill him. Jones Kurt left the house by jumping out of a window and she ran down the street looking for help. An off-duty police officer who lived on the street offered her assistance. Multiple officers responded to the house after defendant barricaded himself inside. After about two hours, the door was forced open and defendant was still in the house. Morris was discovered dead in the bathroom on the main floor. Morris was not shot, but rather stabbed to death. He had seventeen stab wounds, most of which were in the face and neck. One of the wounds went through his eye and into his brain. It was the prosecution's theory that after Jones Kurt left the house, defendant realized that he could not use the gun because Jones Kurt saw him with the gun, so instead he killed Morris by stabbing him through the eye and into the brain, which caused his death. Defendant stabbed Morris additional times and caused some injuries to himself to make it appear that he stabbed Morris in self-defense.

The police recovered two firearms from the house. A gun and the knife used to stab Morris were placed in a plastic bag left on top of Morris's body on the bathroom floor. The police discovered another firearm in the fireplace, underneath ashes. The gun placed in the plastic bag was not functional because the safety for the trigger had broken off in the "on" position, so it could not be fired. However, the firearm recovered from the fireplace, an automatic handgun, was generally functional, although the hammer had to be manually pulled back to fire a second shot.

Keith Coons, who testified for the prosecution, claimed that defendant intended to kill Morris after defendant was embarrassed by Morris earlier at a party. Coons's testimony confirmed that defendant stabbed Morris, instead of using the gun, because Jones Kurt saw defendant with the gun so defendant made it appear that he stabbed Morris in self-defense. Defendant told Coons that he inflicted injuries on his body to make it appear that he had been in a struggle with Morris.

The defense did not contest that defendant killed Morris. Defendant claimed that he and Morris initially argued over bills related to the house, but defendant confronted Morris about his drug abuse. The defense contended that Morris confronted defendant with one of the guns and hit defendant in the head with it. Morris threatened to kill defendant and hit him again with the gun. Morris even pulled the gun's trigger, but defendant grabbed the gun's handle and it did not discharge, even as they wrestled over it. Defendant grabbed a knife from the bathroom and kept Morris from pulling the trigger. He continued to stab Morris with the knife until Morris dropped the gun. While defendant struck the fatal blow, the defense contended that it was done in self-defense.

## II. COUNSEL'S ISSUES

## A. PROSECUTORIAL MISCONDUCT

Defendant first argues that it was error for the trial court to deny his motion for a new trial on the ground that the prosecutor committed misconduct. We disagree.

Where the defendant preserves a claim of prosecutorial misconduct, this Court reviews the record de novo to determine if the defendant was denied a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). This Court will not reverse if the

prejudicial effect of the prosecutor's comments could have been cured by a timely instruction from the trial court. *People v Williams,* 265 Mich App 68, 71; 692 NW2d 722 (2005), aff'd 475 Mich 101 (2006). When an issue was not preserved by objection in the trial court, this Court will reverse "only when a plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *People v Abraham,* 256 Mich App 265, 274-275; 662 NW2d 836 (2003) (footnote omitted). In order to prove that plain error occurred, defendant must show that (1) an error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the error affected substantial rights, meaning, the error affected the outcome of the trial. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Reversal is warranted only if the defendant is actually innocent of the crime or if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

Defendant raised this issue in his motion for a new trial. "A trial court may grant a new trial to a criminal defendant on the basis of any ground that would support reversal on appeal, or because it believes that the verdict has resulted in a miscarriage of justice." *People v Jones*, 236 Mich App 396, 404; 600 NW2d 652 (1999); MCR 6.431(B). The trial court's decision to deny defendant's motion for a new trial is reviewed for an abuse of the trial court's discretion. *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008). An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes. *Id.*

Defendant contends that the trial court's ruling to quash the felony-firearm charge barred the prosecution from offering any evidence related to firearms. Yet, defendant does not explain where in the prosecutor's closing argument he wrongly argued the dismissed count. In reviewing the prosecutor's closing argument, the prosecutor made it clear that defendant was charged with second-degree murder. When discussing the elements of that offense, the prosecutor clearly stated that Morris died because he was stabbed by defendant. Thus, the prosecutor's theory had nothing to do with the use of one of the firearms to kill Morris. The prosecutor emphasized to the jury that this case came down to defendant's state of mind, which included considering his claim of self-defense.

In discussing the facts, the prosecutor explained that Jones Kurt described defendant saying that he was going to kill Morris while he held the gun:

Now, we'll get into that a little bit later, but when they get downstairs, she says that Lewis McClaine is saying I'm tired of you messing with me, I'll use a different word, and she says you all please stop fighting and he said I'm tired of you b****es, too. He said I'll kill you. I have been to jail. He admitted that he was in jail, but in any event he says I'll kill you, I'll kill you and he has the gun up in the air and this is important because she says it was the dark colored gun.

She said it was the dark colored gun. Now, we have a dark colored gun here on People's Proposed Exhibit Number Twenty and she says Lewis McClaine has this gun up in the air. I'm going to kill you.

All right. Where do we find that gun later, the dark colored gun? The dark colored gun as we see in People's Proposed Exhibit Number Fifteen, is shown in the fireplace and you can compare that's the gun.

Okay. Now, if this is the gun that Lewis McClaine has in his hand by the stairway, how does it end up in the fireplace? Lewis McClaine says he didn't know any gun was in the fireplace. This is the gun. Look at it. You decide whether that's the same gun or not.

People's Exhibit 15 was a photograph showing the firearm in the fireplace, while People's Exhibit 20 was the actual gun an officer testified was found in the fireplace, which was a Star nine-millimeter automatic handgun.

The prosecutor argued that defendant knew that Jones Kurt saw him with that gun and there was testimony that the gun found in the fireplace was the one of the two that worked and could be fired. The prosecutor explained why defendant could no longer use the gun:

He can't use the gun now because there's a witness. At that point Mr. McClaine comes up with this—I'll call it a toe picker and he said this is the knife that someone uses to clean their toes. I wouldn't try to do that. This knife.

The prosecutor's theory was that defendant intended to use the gun to shoot Morris, but if he had done that, Jones Kurt would have been able to identify defendant as killing Morris. It also appears that putting the gun in the fireplace, under the ashes, was a way to hide it and get it away from the area where Morris and defendant struggled. The prosecutor continued with this argument:

Officer Johnson testified that he went to the kitchen window and saw Lewis McClaine come and get a glass of water and walk out and as he's there he's pounding on the window, hey, police, police.

Lewis McClaine ignored him, but Lewis McClaine is pretty sharp. He's a pretty sharp guy. He figures, well, there's a way to get out of this. There's a way to get out of this. He puts the knife—puts that in a bag and I'll take a gun, but not the gun that Debra Jones saw there.

I have to put that in the fireplace. Okay. I'll put that in the fireplace. Then I'll put this other gun with the knife, okay, and put it in the jacket and put it on top of Allen Morris.

This is the other thing that tripped up Lewis McClaine. He says and testified and I asked him which gun did Allen Morris use when you say he threatened you and he hit you, and Lewis McClaine said it's the gun with the rubberbands and that's why I brought in Officer Dragon, Paul Dragon, the firearm's man.

This gun don't work. This gun does not work, okay. You can rack it, but the safety is broken and it's on the on position. See the trigger. It just pulls. It doesn't do anything. This hammer can't be pulled back by the trigger. You can pull that trigger all day long. It won't fire.

If Allen Morris is a big cocaine man and he's going to use a gun to threaten somebody is he going to take a gun that don't work and get his own head broke off?

-4-

Remember Lewis McClaine's testimony.  He said Allen Morris came out of the back with the gun that don't work.

Lewis McClaine didn't know that.  He said I'll put that on the body and say that's the gun that Allen Morris used, but that gun don't work and Allen Morris, no matter how many problems he had, I guarantee you he is smart enough to not use a gun that don't work.  That's what tripped up Lewis McClaine and he was being so cute on the stand and answering the questions and that that's the gun that Morris had.

The prosecutor emphasized at the end of his argument that the gun Jones Kurt saw defendant holding was the "dark gun" and that defendant hid it in the fireplace.

In the prosecutor's rebuttal argument, he again emphasized that if Morris was "a big dope man," he was not going to take a broken gun into the house, referring to the gun that could not be fired because the hammer would not go back.  The prosecutor again stated that defendant put the other firearm that worked in the fireplace because he had to get rid of it.  The prosecutor argued to the jury that the defense could not explain how that gun got into the fireplace or how the other gun and knife were placed on top of Morris's body, while his pockets were left turned inside out.

Defendant contends that any evidence related to firearms should not have been admitted at trial after the trial court quashed the felony-firearm charge.  While defendant attempts to support this argument by relying on res judicata or collateral estoppel, it is apparent that those doctrines do not apply because they involve rulings applied to subsequent proceedings.  See *People v Maye*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 357233); slip op at 4; *People v Zitka*, 335 Mich App 324, 343-344; 966 NW2d 786 (2020).  However, more importantly, the trial court's legal ruling to quash the felony-firearm charge is not the same as an evidentiary ruling barring admission of evidence related to firearms.  Defendant's argument is that no evidence of firearms should have been admitted at trial, but that argument cannot be supported by the trial court's ruling to dismiss the felony-firearm charge due to legally insufficient evidence introduced at the preliminary examination.

The prosecutor was allowed to present evidence on the firearms found at the scene because witnesses described the presence of the firearms.  In particular, Jones Kurt testified that defendant was armed with a firearm during his struggle with Morris.  The firearms also played a role in defendant's claim of self-defense when he testified that he stabbed Morris after Morris pulled out a gun.  The prosecutor also used the possession of a firearm by defendant to explain his intent to kill Morris, even though he did not use the weapon to accomplish the act.  The prosecutor's theory was that defendant decided to stab Morris after he knew that Jones Kurt saw him with the firearm and she could implicate him if Morris was shot.  For that reason, defendant stabbed Morris and made it appear that there was a struggle so that defendant could claim self-defense.

The record does not support defendant's claim of prosecutorial misconduct.  Instead, this was solely an evidentiary issue, which was dictated by the facts of this case.  "A prosecutor's good-faith effort to admit evidence does not constitute misconduct."  *People v Dobek*, 274 Mich App 58, 70; 732 NW2d 546 (2007).  Because the facts of this offense involved the presence and use of firearms, the prosecutor was acting in good-faith by presenting evidence related to how the

firearms were factors in this crime, despite the trial court's decision to quash the felony-firearm charge.

Defendant also argues that the prosecutor misrepresented which firearm was found in the fireplace. The evidence showed that the police recovered the nonfunctioning firearm (the Smith and Wesson) in the bag on top of Morris in the bathroom. The functioning firearm was found in the fireplace, underneath ashes, which led the prosecutor to argue that defendant tried to hide it there. Jones Kurt testified that defendant had "a grey automatic long gun" when they were at the base of the stairway. As noted above, the prosecutor argued during his closing argument that, according to Jones Kurt, defendant used the "dark colored gun," which was important because the dark-colored gun was the one found in the fireplace and it was functional.

Specifically, defendant argues that the testimony established that the Smith and Wesson nonfunctioning gun was the dark-colored gun, while the functional weapon was described only as "gray." The Smith and Wesson gun was described as having rubber bands around the handle, but the color was not given when it was admitted as evidence. Also, the firearm recovered from the fireplace was not identified by its color when it was admitted at trial. Although Jones Kurt described the weapon used by defendant as "gray," that does not prove that the prosecutor's comments about that weapon also being "dark colored" were inaccurate. Because the color of both weapons is not known, this Court cannot say that the prosecutor's statement was clearly wrong. Nonetheless, even if the prosecutor's statement was wrong, this is the type of matter that the jury could plainly determine itself on the basis of the evidence admitted. The weapons were available for the jurors to see. If the prosecutor wrongly characterized this evidence, the jurors could use their common sense to evaluate this evidence. It is a stretch for defendant to argue that the prosecutor was intentionally attempting to mislead the jury when it would have been obvious if the prosecutor inaccurately described the weapon found in the fireplace as matching the description of the weapon Jones Kurt saw defendant holding.

On either of his arguments, defendant has not shown that plain error occurred because the jury heard about firearms used in this offense. For this reason, the trial court did not abuse its discretion in denying his motion for a new trial.

### B. EX PARTE COMMUNICATION

Defendant next argues that the trial court erred in denying his motion for a new trial on the ground that the trial court engaged in ex parte communication with the jury while it was deliberating. We disagree.

"A trial court may grant a new trial to a criminal defendant on the basis of any ground that would support reversal on appeal or because it believes that the verdict has resulted in a miscarriage of justice." *Jones*, 236 Mich App at 404; MCR 6.431(B). A trial court's decision to deny a defendant's motion for a new trial is reviewed for an abuse of the trial court's discretion. *Miller*, 482 Mich at 544. An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes. *Id*. Any issues of law decided by the trial court are reviewed de novo. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011).

In the trial court's instructions to the jury, it explained that the jury could ask to view the exhibits admitted into evidence:

> If you wish to examine more closely the exhibits which have been admitted into evidence while you are deliberating, please have your foreperson write a note and give it to the officer. The exhibits will then be given to you and you may examine them in the jury room.
>
> The only items I won't give you in the jury room are the guns, the bullets and the knife. If you want to see them you can look at them while seated in the jury box. I won't let those go in the jury room.

The jury left the courtroom at 1:57 p.m. to begin deliberations and the record shows that the trial was in recess. Next in the transcript is a note from the court reporter that "the Judge is talking to the jury at the jury room door." The record next shows that the trial court addressed the jury's request to review the exhibits:

> *THE COURT*: Ladies and gentlemen, I received your note. You can have the photographs and the medical report. Those are the only two items that were in evidence. The statement of the first officer to arrive at the scene was not admitted and the statement of all police reports were not admitted. You can not have those and the two guns and the knife, when you want to see those you'll all come out and when you want to start with this and if you want to look at the guns and the knife you can come out here and examine them.
>
> (*Whereupon the jury is entering the courtroom at 2:15 p.m.*)
>
> *THE COURT*: Okay. Give it to the gentleman right here and start there and let him pass it around. One at the top and work it two ways.
>
> *OFFICER McKINNON*: The weapon has been cleared.
>
> (*Whereupon the two guns are being given to the jury to pass around in the courtroom.*)
>
> *JUROR*: Would it be out of order to have someone show us how the safety works on the gun or how it could have been broken?
>
> *THE COURT*: You'll have to rely on the testimony you heard, sir. Okay. We done with the weapons? Okay. You may work as late as you want. Whenever you're ready to go home knock on the door, but no later than four o'clock and if you have to come back tomorrow you can begin deliberations at nine o'clock. It's up to you folks. Whenever you're ready to go for the day let me know. Knock on the door and send a note.
>
> (*Whereupon the jury left the courtroom at 2:22 P.M. to continue deliberations.*)

(*Proceedings adjourned for the day*.)

The record does not show that any of the attorneys were present when the trial court addressed the jury's note. Defendant claims that he and his counsel were not present, but that has not been established. Nonetheless, assuming that defendant and his attorney were absent, we find that defendant was not prejudiced by the trial court's communication with the jury.

Defendant argues that this Court should treat the alleged ex parte communications as newly discovered evidence.[1] Because the trial court's communication with the jury is not actually evidence that would have been admitted at trial, we decline to treat this issue as one involving newly discovered evidence, even though, procedurally, defendant claims he did not know about the communications with the jury at the time of trial.

In *People v France*, 436 Mich 138, 142; 461 NW2d 621 (1990), the Court modified the former rule of automatic reversal when there is an ex parte communication between the trial court and the deliberating jury outside the courtroom and the presence of counsel. The Court explained that in order to reverse, there must be a showing of "any reasonable possibility of prejudice," a broad definition of prejudice. *Id*. (quotation marks omitted).

We find that communication with a deliberating jury can be classified into one of three categories: substantive, administrative, or housekeeping. Upon appeal, it is incumbent upon a reviewing court to first categorize the communication that is the basis of the appeal. This will necessarily lead to the determination of whether a party has demonstrated that the communication was prejudicial, or that the communication lacked any reasonable prejudicial effect.

Substantive communication encompasses supplemental instructions on the law given by the trial court to a deliberating jury. A substantive communication carries a *presumption* of prejudice in favor of the aggrieved party regardless of whether an objection is raised. The presumption may only be rebutted by a firm and definite showing of an *absence* of prejudice.

Administrative communications include instructions regarding the availability of certain pieces of evidence and instructions that encourage a jury to continue its deliberations. An administrative communication carries no presumption. The failure to object when made aware of the communication will be taken as evidence that the administrative instruction was not prejudicial. Upon an objection, the burden of persuasion lies with the nonobjecting party to demonstrate that the communication lacked any prejudicial effect. Alternatively, a reviewing court, upon its own volition, may find that an instruction which encourages a jury

---

[1] In order to grant a new trial due to newly discovered evidence, the defendant is required to show that (1) the evidence itself, not merely its materiality, is newly discovered; (2) the newly discovered evidence is not cumulative; (3) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. *People v Cress*, 468 Mich 678, 692; 664 NW2d 174 (2003).

to continue its deliberations was prejudicial to the defendant because it violated the ABA Standard Jury Instruction 5.4(b), as adopted by this Court in *People v Sullivan*, 392 Mich 324; 220 NW2d 441 (1974).

> Housekeeping communications are those which occur between a jury and a court officer regarding meal orders, rest room facilities, or matters consistent with general "housekeeping" needs that are unrelated in any way to the case being decided. A housekeeping communication carries the presumption of no prejudice. First, there must be an objection to the communication, and then the aggrieved party must make a firm and definite showing which effectively rebuts the presumption of no prejudice. [*France*, 436 Mich at 142-144 (footnotes omitted).]

If there was an ex parte communication, it involved only administrative matters. The trial court responded to the jury's request to view exhibits, including photographs, the medical examiner's report, and the weapons. The court instructed the jury that it could not review the statement of the first police officer to arrive on the scene when it, as well as the other police reports, were not admitted into evidence. The court's comments to the jury were consistent with its earlier instructions, to which the parties expressed satisfaction, that advised the jury that it could request those exhibits admitted into evidence only, and the guns, knife, and bullets could only be observed in the jury box. The trial court's instructions were similar to the communications involved in *France*, *id*. at 165, which were held to be administrative.

Because the above communications with the jury were administrative only, not substantive, even if the burden of persuasion is on the prosecution, there is no basis for finding that defendant was prejudiced by the trial court's remarks. Again, the trial court merely made exhibits available to the jury, as it previously provided for in its earlier instructions. The court's comments about not providing the jury with police statements or reports were consistent with the court's previous instructions when the court was merely refusing to provide the jury with items that were not admitted as evidence.

To the extent that defendant claims that his right to counsel at a critical stage was denied, again he is not entitled to relief. The right to counsel under the Sixth Amendment provides that a defendant shall have the right to the assistance of counsel at critical stages of the proceedings. *People v Buie*, 298 Mich App 50, 61; 825 NW2d 361 (2012). "It is well established that a total or complete deprivation of the right to counsel at a critical stage of a criminal proceeding is a structural error requiring automatic reversal." *People v Willing,* 267 Mich App 208, 224; 704 NW2d 472 (2005).

In *French v Jones,* 332 F3d 430, 434, 438 (CA 6, 2003),[2] the Sixth Circuit held that the defendant was deprived of his right to counsel at a critical stage of the proceedings when the court gave the jury a nonstandard deadlocked jury instruction and, therefore, prejudice was presumed.

---

[2] Caselaw from federal courts is not binding precedent, but may be considered as persuasive authority. *People v Craig*, ___ Mich App ___, ___ n 7; ___ NW2d ___ (2022) (Docket No. 357896); slip op at 6 n 7.

On the other hand, some courts have held that the repeating of instructions by the trial court is not a critical stage. The distinction between the two lines of cases depends on whether the trial court, when addressing the jury, was repeating instructions that the jury had already heard and that counsel approved, or if the court was giving the jury new, supplemental instructions. This distinction is critical because counsel's presence at the time instructions are reread will not assist the defendant in avoiding prejudice. However, when the court is giving the jury new, supplemental instructions that were not approved by trial counsel, counsel's absence eliminates the ability of the defendant to avoid prejudice from the instructions, if erroneous, by promptly objecting. Thus, it is a critical stage when the court confers with counsel regarding what instructions to give the jury, but not when the court is merely rereading its earlier instructions. See *United States v Morrison,* 946 F2d 484, 502-504 (CA 7, 1991).

If defendant and his attorney were not present when the trial court gave the jury the above instructions with regard to viewing exhibits, it is again apparent that these were not supplemental or new instructions, but simply the court reiterating its earlier instructions on what exhibits the jury could view. The court merely explained to the jury which specific exhibits it requested would be available and that other exhibits it requested could not be viewed because they were not admitted as evidence. Because the trial court was rereading instructions, defendant has not shown that he was prejudiced by his attorney's absence. Furthermore, as already explained, any objection to the court's instructions would have been futile. For these reasons, defendant is not entitled to relief. The trial court did not err in denying defendant's motion for a new trial.

## C. NEWLY DISCOVERED EVIDENCE

Next, defendant argues that the trial court should have granted his motion for a new trial on the basis of new evidence he procured from Morris's wife, Rhonda Morris ("Mrs. Morris"). We disagree.

This Court reviews a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable principled outcomes. *Miller*, 482 Mich at 544. A mere difference of judicial opinion does not establish an abuse of discretion. *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018).

In September 2014, defendant received an affidavit from Mrs. Morris, who had testified at trial, in which he claims Mrs. Morris provided the following newly discovered evidence:

(1) I, Rhonda Denise Morris, the affiant state that I was married to Allen Morris who is now deceased. He was addicted to Heroin, Cocaine and Methadone.

(2) My Former Husband the deceased, Allen Morris, was mentally and physically abusive toward me during my marriage to him, he threaten[ed] to harm my Mother, Father, Sister and My Friend Mercedes Johnson, who he had some one kill her dog and threaten her life.

(3) In October of 1987 and November 1987, While living at our Apartment in the 5000 Towncenter, in Southfield, Michigan My Former Husband who is now

Deceased made numerous loud outbursts of malicious threats that he would kill Lewis Henry McClaine, during one of these outburst[s] he kicked a hole in the wall during one of his numerous angry tyrant mood swings.

(4) I never informed Lewis or his Attorney, the Prosecution and the Judge when I testified during his Trial of this information.

The trial court denied defendant's motion for a new trial when he could not prove that this was newly discovered evidence and that it would have made a difference in the trial's outcome.

In order to grant a new trial due to newly discovered evidence, the defendant is required to show that (1) the evidence itself, not merely its materiality, is newly discovered; (2) the newly discovered evidence is not cumulative; (3) the defendant could not, with reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial. *Cress*, 468 Mich at 692. Newly discovered evidence may be grounds for granting a new trial even if it could only be used for impeachment purposes, provided the defendant can satisfy the four-part test from *Cress*. *People v Grissom*, 492 Mich 296, 299-300; 821 NW2d 50 (2012). "[A] material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial." *Id.* at 300. The newly discovered evidence "may be of a general character and need not contradict specific testimony at trial," but it must make a different result probable on retrial. *Id.*

Applying the test from *Cress* to the proposed new evidence, we believe that defendant could have discovered and produced these statements at the time of the trial through the exercise of reasonable diligence. Mrs. Morris was a witness at trial. Defendant testified he knew her and considered her his aunt. Mrs. Morris testified that she knew defendant for three years. She could have been questioned about all of these areas during cross-examination. There is no basis for concluding that this testimony was not available to defendant at the time of trial.

Second, the averments about Morris's drug abuse were cumulative. The jury heard about his use of illegal controlled substances because of the admission of the toxicology results. Because this testimony was cumulative, it does not support granting defendant a new trial. *Cress*, 468 Mich at 692.

Also, the averments about Morris's threats and violence against Mrs. Morris, her family and friends, and a dog would also not have been admissible because these appear to involve specific incidents of Morris's conduct. Evidence of the aggressive character of a homicide victim, even if unknown to the defendant at the time, is admissible in furtherance of a self-defense claim to prove that the victim was the probable aggressor. MRE 404(a)(2); *People v Harris*, 458 Mich 310, 315-316; 583 NW2d 680 (1998). However, this type of character evidence may only be admitted in the form of reputation testimony. Testimony regarding specific instances of conduct is not admissible unless the testimony regarding those instances is independently admissible for some other reason or where character is an essential element of a claim or defense. MRE 405; *Harris*, 458 Mich at 318-319. Here, defendant appears to offer the testimony of other incidents by Morris only to prove that Morris was the aggressor. There is no claim that defendant knew about these incidents to prove that defendant knew of Morris's character for violence at the time he

stabbed Morris. See *id*. at 316-317. For this reason, defendant has not shown that this evidence is admissible at trial.

With respect to the threats and outbursts Morris allegedly made against defendant about one or two months before this incident, specifically threatening to kill defendant, the trial court ruled that these statements were too remote from this incident to be admitted. Statements by the victim threatening the defendant can be used to prove that the victim was the aggressor. See *People v Wright*, 294 Mich 20, 27; 292 NW 539 (1940); MRE 803(3). The trial court found that previous cases applying this rule involved statements made near the time of the incident. Otherwise, such statements may not be considered relevant. See *Wright*, 294 Mich at 26-30; *People v Ake*, 362 Mich 134, 136-137; 106 NW2d 800 (1961). Further, even if this argument involves a closer evidentiary question than the other averments, defendant did not support his claim that this evidence was newly discovered.

Accordingly, we find that the trial court did not abuse its discretion in denying defendant's motion for a new trial on the basis of newly discovered evidence.

### D. INEFFECTIVE ASSISTANCE OF COUNSEL

In his motion for a new trial, defendant also argued that he was denied the effective assistance of counsel and requested that the trial court conduct an evidentiary hearing on this issue. We agree with the trial court that the need for an evidentiary hearing was not demonstrated and defendant failed to show that he was denied the effective assistance of counsel.

On the merits of defendant's claims of ineffective assistance of counsel, the standard of review on questions of ineffective assistance of counsel is a mixed standard. First, where the trial court finds certain facts in relation to a claim of ineffective assistance of counsel, those findings are reviewed for clear error. MCR 2.613(C); *People v LeBlanc,* 465 Mich 575, 579; 640 NW2d 246 (2002). Second, whether the test for ineffective assistance of counsel was satisfied involves a question of constitutional law and the standard of review is de novo. *LeBlanc*, 465 Mich at 579. Here, the trial court did not conduct an evidentiary hearing and the court did not preside over this trial. Therefore, only the de novo standard applies when reviewing the trial court's decision to deny granting defendant a new trial. A trial court's decision to deny an evidentiary hearing is reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Id*. at 217.

To prove ineffective assistance of counsel, the defendant must show that his counsel's performance was deficient. This involves considering, "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022). The defendant must also show that the error was prejudicial. *Id*. To prove this, the defendant must show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id*. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

In proving that trial counsel's performance was deficient, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Counsel will only be found ineffective based on strategic decisions if the strategy employed was not sound or reasonable. *People v Cline,* 276 Mich App 634, 637; 741 NW2d 563 (2007). In matters of trial strategy, this Court will not substitute its judgment for that of trial counsel. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). The failure to advance a meritless argument or raise a futile objection does not amount to ineffective assistance of counsel. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## 1. EVIDENTIARY HEARING

Defendant believes that he demonstrated the need for an evidentiary hearing and that it was error for the trial court to refuse to conduct one on his claim of ineffective assistance of counsel. When a defendant's claim of ineffective assistance of counsel is based on facts not on the record, he may ask for an evidentiary hearing to create a record for appeal. *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). As noted, a trial court's decision to deny an evidentiary hearing is reviewed for an abuse of discretion. *Unger*, 278 Mich App at 216-217.

The trial court rejected defendant's request for an evidentiary hearing because the court reviewed the arguments he raised on the existing record and it did not believe that defendant demonstrated why further development of the record was necessary, but that this was a "fishing expedition" that wasted the court's time and resources. As explained below, the merits of the issues raised by defendant did not support his claims that his trial attorney was ineffective. Furthermore, defendant failed to provide offers of proof that supported further expanding the record. Accordingly, the trial court did not abuse its discretion by refusing to grant defendant an evidentiary hearing.

## 2. TRIAL COUNSEL'S DISCIPLINARY PROCEEDINGS

Defendant was represented by attorney Seymour Floyd at trial in 1988. Three years later, in 1991, Floyd was subject to a formal complaint filed by the Attorney Grievance Commission involving multiple counts and clients, including defendant. The allegations against Floyd related to defendant's case primarily involved the failure to challenge a search and Floyd's failure to pursue defendant's appeal as of right after he was sentenced. Floyd did not respond to the complaint and a default was entered after a second complaint was filed. The order of suspension provides that Floyd was suspended from the practice of law from June 23, 1991, to June 1, 1993. There was a previous order suspending Floyd from the practice of law for eight months. Part of the Attorney Discipline Board's order provided that Floyd was required to obtain a substance abuse evaluation and enter into treatment.

Defendant also produced an affidavit from attorney Robert Slameka from September 1993, who stated that, "based upon information and belief, that trial counsel's performance in the representation of Petitioner herein was less than effective due to the ingestion of controlled substances." Slameka's affidavit fails to disclose any information to establish that his statements were based on his personal knowledge. For this reason, this affidavit fails to support any of defendant's claims that Floyd's substance abuse impacted his performance during this trial.

There is no question that defendant produced evidence that supported his claim that his trial attorney had an apparent substance abuse problem, for which he was suspended from the practice of law. However, the allegations made against Floyd in those proceedings involved his failure to move to suppress a warrantless search and the failure to pursue defendant's appeal as of right immediately after he was sentenced. Although Floyd's conduct supported the disciplinary action, defendant is not arguing any claim with regard to the warrantless search. And while Floyd's failure to pursue defendant's appeal is well documented, defendant is now afforded an appeal and he has not shown how earlier pursuing this appeal would have made a difference in the outcome.

While the record shows that Floyd did not meet the standard for performing as effective counsel during the period when he was representing defendant, defendant has not connected the facts surrounding Floyd's disciplinary proceedings with the arguments made in this issue related to Floyd's performance in these proceedings. At most, defendant has shown that Floyd was suffering from a substance abuse problem that may have impaired his performance in these proceedings. However, defendant must also show that Floyd's performance was affected by the alleged substance abuse. The existing record does not prove that defendant was prejudiced by Floyd's alleged substance abuse problem.

### 3. JURY INSTRUCTIONS ON A LESSER INCLUDED OFFENSE

Defendant was charged with second-degree murder and the trial court did not give the jury any instructions on lesser included offenses. However, because the jury was instructed on self-defense, which was the defense's only theory, if the jury believed the defense's evidence, then the jury should have found that the killing was excused and defendant would not have been found guilty. The self-defense theory was an "all or nothing" defense.

Defendant argues that his trial counsel should have requested an instruction on voluntary manslaughter as a lesser included offense. "[M]anslaughter is a necessarily included lesser offense of murder because the elements of manslaughter are included in the offense of murder." *People v Mendoza*, 468 Mich 527, 536; 664 NW2d 685 (2003). "[T]he element distinguishing murder from manslaughter—malice—is negated by the presence of provocation and heat of passion. Thus . . . the elements of voluntary manslaughter are included in murder, with murder possessing the single additional element of malice." *Id*. at 540. "Consequently, when a defendant is charged with murder, an instruction for voluntary . . . manslaughter must be given if supported by a rational view of the evidence." *Id*. at 541.

Counsel's decision to decline to request a particular jury instruction can constitute effective trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Which instructions to request falls within the wide range of discretion accorded to counsel, and a defendant must overcome the presumption that his counsel's actions were reasonable strategy. *Id*. Furthermore, an "all or nothing" defense involves a legitimate trial strategy. *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982).[3] Here, it was a matter of strategy if the defense

---

[3] Cases by this Court decided before November 1, 1990 are not binding. MCR 7.215(J)(1). Although this Court is "not strictly required to follow uncontradicted opinions from this Court

might have pursued other theories that could have supported lesser offenses. However, because defendant testified in support of his self-defense claim, it appears that the defense strategy was solely to focus on self-defense. Defendant has not shown any merit to the trial court concluding that pursuing an "all or nothing" defense was an unreasonable strategy or one that he did not agree with pursuing.

Even if trial counsel never discussed this subject with defendant to allow defendant to make an informed decision on whether to have the jury instructed on a lesser included offense, the evidence would not have supported an instruction on voluntary manslaughter. To prove voluntary manslaughter, there must be evidence that (1) the defendant killed in the heat of passion; (2) the passion was caused by adequate provocation; and (3) there was no lapse of time during which a reasonable person could have controlled his passions. *People v Tierney*, 266 Mich App 687, 714; 703 NW2d 204 (2005). The degree of provocation required to mitigate a killing from murder to manslaughter is that which causes the defendant to act out of passion rather than reason. *Id*. at 714-715. In order for the provocation to be adequate, it must be that which would cause a reasonable person to lose control. *Id*. There was no evidence that defendant stabbed Morris in the heat of passion brought about by adequate provocation. Instead, defendant testified that he stabbed Morris to protect himself, consistent with self-defense. Defendant explained that he tried to reason with Morris. There was no testimony offered to support the inference that defendant stabbed Morris out of passion as a result of adequate provocation. For this reason, defendant has not shown that he was prejudiced because his attorney did not request that the court instruct the jury on voluntary manslaughter. Compare *People v Mitchell*, 301 Mich App 282, 286-289; 835 NW2d 615 (2013).

### 4. EVIDENCE RELATED TO THE DISMISSED CHARGES

Defendant argues that his trial counsel was ineffective for not properly moving to quash evidence related to the charges dismissed by counsel's motion to quash—first-degree murder and felony-firearm. However, such a motion would have been futile to keep the evidence related to the firearms out of the trial, as previously explained. Defendant has not shown that his counsel's failure to attempt to bar this evidence was prejudicial to his defense.

### 5. FAILURE TO OBJECT TO PROSECUTOR'S MISCONDUCT

Defendant also claims that trial counsel was ineffective for not objecting to prosecutorial misconduct. Defendant presumably refers to the previously discussed arguments related to prosecutorial misconduct. For reasons previously stated, defendant has not shown that he was prejudiced by his counsel's failure to object.

### 6. EX PARTE COMMUNICATION

Defendant also claims that his trial counsel was ineffective because counsel did not make an objection regarding the trial court's claimed ex parte communications with the deliberating jury.

---

decided prior to November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *People v Bensch*, 328 Mich App 1, 7 n 6; 935 WN2d 382 (2019) (quotation marks and citation omitted).

As previously explained, an objection to this incident would not have resulted in a different outcome. Defendant therefore has not shown that he was prejudiced by his counsel's failure to raise this issue before the trial court.

## 7. OTHER CLAIMS

In his brief, defendant states that his trial counsel failed to move for a mistrial and also failed to object to an omission in the trial court's instructions. Defendant has not offered any actual argument on these points. Because it is not apparent what defendant is arguing with regard to these claims, defendant has abandoned these claims for failure to properly develop his arguments. *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004).

The trial court did not abuse its discretion in refusing to grant defendant a new trial or an evidentiary hearing on his claims of ineffective assistance of counsel.

## E. SENTENCING

Next, defendant argues that he is entitled to be resentenced because the trial court considered acquitted conduct when sentencing him and his sentence amounts to cruel or unusual punishment.

At his sentencing in 1988, the trial judge made comments on the record about defendant's conviction in response to defendant's statement that the evidence was misrepresented and he was innocent:

> [*Defendant*:] He never knowing about the hammer coming back, but I know the hammer came back that night and I don't know what happened to it afterwards and if it was my intention to kill this man in cold blood why would I have a pistol that is malfunctioning?
>
> I wasn't the one on drugs and I'm still pleading that I'm innocent.
>
> *THE COURT*: If I thought you premeditated it I wouldn't have reduced the charge from murder one to murder two and, in fact, the jury was upset with me when they found out what I did. They thought that you should have been guilty of murder one. . . .

The court's sentencing decision was as follows:

> *THE COURT*: The only conviction I'm going to consider in my sentence is the one I have him on probation for, assault to do great bodily harm less than murder. It's a nolo plea and I took a gamble on him and put him on probation and that showed me to be a bad judge of character and the Department of Corrections for letting him out early on the felony firearm showed that they made a mistake, too.
>
> I'm going to follow the wishes of the jury. They figured you should spend the rest of your life in jail and the guidelines are twenty years to life as a minimum

sentence and the sentence I'm going to meet [sic, mete] out is because I'm going to deviate from the guidelines; not really deviating. It's within the two hundred and forty months to life, just so the higher Courts are understanding I'm going to give the sentence I'm going to give, I don't think this Defendant could ever be disciplined and I'm going to protect society by keeping him off the streets for as long as the Department of Corrections will keep him under the sentence I'm going to meet [sic] out because I don't believe there's any potential of reformation of Mr. McClaine and to send the word out to other people in the community that if they're going to violate the law, then maybe this will put something in their minds in an attempt to deter them and now I'm going to meet [sic] out the toughest sentence I have ever given in this court and those are the reasons because I think you're a bad guy and a danger to the community, to society and to yourself. You stabbed this individual in the eye with the knife.

The sentence of this Court is you be committed to the State Prison of Southern Michigan Department of Corrections for a period of not less than two hundred years nor more than four hundred years.

\* \* \*

*THE COURT*: It's high time the courts in this country wake up and start thinking of the victim and society in general and start meeting [sic] out sentences that do the job and try to keep vicious people off the streets.

Our Supreme Court held in *People v Beck*, 504 Mich 605, 609; 939 NW2d 213 (2019), that "[o]nce acquitted of a given crime, it violates due process to sentence the defendant as if he committed that very same crime." In *Beck*, *id*. at 609-610, because the trial court relied in part on acquitted conduct when it imposed a sentence that departed from the sentencing guidelines, the Court vacated the sentence and remanded for resentencing. While trial courts may continue to sentence for uncharged conduct using the preponderance-of-the-evidence standard, when a jury has found beyond a reasonable doubt that the defendant did not engage in certain charged conduct, the defendant is still presumed to be innocent. *Id*. at 626-627. Considering that same conduct at sentencing is fundamentally inconsistent with the presumption of innocence and violates the defendant's right to due process. *Id*.

Defendant relies solely on the trial court's ruling to reduce the first-degree murder charge to argue that he was acquitted of that count and the trial court wrongly referred to it in its sentencing decision. However, the jury never evaluated the evidence on the first-degree murder charge. As the trial court ruled, where a jury has not made findings, a trial court may consider uncharged conduct at sentencing, using the preponderance-of-the-evidence standard. *Id*. at 626.

Next, defendant argues that his sentence of 200 to 400 years is cruel or unusual punishment under the state constitution, Const 1963, art 1, § 16. In evaluating the proportionality of sentences under the "cruel or unusual punishment" clause, courts are required to consider:

(1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other

-17-

jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically rooted in Michigan's legal traditions . . . . [*People v Parks*, 510 Mich 225, 242; 987 NW2d 161 (2022) (quotation marks and citations omitted).]

At the time of sentencing in 1988, defense counsel admitted that defendant had three prior felony convictions, although the trial court informed defendant that it would only consider one additional conviction that defendant had before the same judge. The court also refused to consider any of defendant's arrests or cases that were dismissed.

The guidelines were twenty years to life. The trial court's minimum sentence of 200 years was considered by the trial court to be within the guidelines because a life sentence was within the guidelines. However, the court's comments suggest that the trial court believed that the sentence was justified even if it was outside of the guidelines. When defendant later moved for resentencing in 1991, the trial judge confirmed that if he exceeded the guidelines, the sentence imposed was justified, considering the principle of proportionality.

Defendant was sentenced under the first version of the guidelines, which resulted in a range of "240-LIFE." It is apparent why the trial court was confused over whether the minimum sentence imposed fell within the guidelines range when the 1982 version of the guidelines did not acknowledge that the statutory sentence for second-degree murder is life *or* any term of years. MCL 750.317. Despite the trial court's understandable confusion over the guidelines range, the court's reasoning for departure from the guidelines was the need to protect society.

There is no question that the facts of this case justified a harsh sentence. Even though defendant was 24 years old at the time of this offense, he already had a prior record of violent conduct. The facts of this case were horrendous, as defendant stabbed the victim, whom he considered an uncle, 17 times. However, based on the trial court's comments at sentencing, it appears that defendant was sentenced as if he committed first-degree murder, which the trial court dismissed after defendant moved to quash his bindover. The sentencing judge stated that the jury thought defendant should have been tried for first-degree murder, and the judge "follow[ed] the wishes of the jury" in sentencing defendant. This was improper. The trial court was not justified in treating defendant as if he had committed a premeditated murder based on the feelings of the jury. Thus, under the first factor, the severity of the sentence relative to the gravity of the offense, defendant's sentence is disproportionate.

Under the second factor, sentences imposed in this state for other offenses, it is clear that this is an extreme sentence. Defendant correctly points out that as of 2018, 3,854 persons were serving prison sentences for second-degree murder and that the average sentence was 26.6 years. Of this amount, 538 were serving life terms. While other defendants convicted of second-degree murder serve an average term of 26.6 years, defendant acknowledges that a life term has been imposed in a significant number of cases for second-degree murder.[4] However, there is no dispute

---

[4] Michigan Department of Corrections 2018 Statistical Report, <https://www.michigan.gov/corrections/-/media/Project/Websites/corrections/Files/Statistical-

that defendant is effectively serving a life term without the possibility of parole. While it is unclear how many individuals convicted of second-degree murder are serving terms that amount to life without the possibility of parole, it appears that this severe of a sentence is not typical or common. His sentence of 200 to 400 years is overly punitive, as he cannot possibly serve a minimum term of 200 years, and in excess of what the jury actually found him guilty of—second-degree murder. As for sentences in other jurisdictions, defendant acknowledges that across the nation, as of 2016, there were about 162,000 people serving life sentences for the same offense and 44,311 people are serving de facto life sentences in other jurisdictions.[5]

As for the goal of rehabilitation, the reason for the trial court's sentence was its belief that defendant lacked the potential for rehabilitation, given his record of violent crimes in his short lifetime and the need to protect society. Defendant was 24 years old at the time, and had a violent criminal record.

In sum, defendant has received the most extreme sentence possible for second-degree murder. Although the facts of the crime and defendant's criminal history justified a harsh sentence, the imposed sentence of 200 to 400 years' imprisonment is disproportionate to the jury verdict of second-degree murder, amounting to cruel or unusual punishment. Therefore, defendant's sentence is vacated, and he is entitled to resentencing.

## III. DEFENDANT'S STANDARD 4 BRIEF

In his Standard 4 brief, defendant argues that his sentence is invalid and unconstitutional because the trial court failed to consider his age at the time of the offense. Defendant was 24 years old when he committed this offense. Defendant argues that more recent research and rulings of appellate courts regarding the delayed development of the brains of those between the ages of 18 and 25 years should apply because of his age at the time of this offense.

Defendant relies on *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and the line of cases addressing life sentences imposed against juveniles without the possibility of parole, including those 18 years old, as cruel or unusual punishment because of the young age of the offenders. This Court recently addressed this issue in *People v Adamowicz (On Second Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (Docket No. 330612), slip op at 2-4 (footnotes omitted), where the defendant was 21 years old, and concluded that our Supreme Court's rulings on this issue have not extended the holding of *Miller* to cases in which the defendant is over the age of 18 years. Defendant clearly was well beyond the age of 18 years when he committed this crime. Because the courts of this state have not extended rulings on this subject

---

Reports/Statistical-Reports/2018-Statistical-Report.pdf?rev=110f2f9d5cd44084bb5601b8b92d57a7&hash=13A6D9D6B5453EC9D022DB9FD1F34D75>, p C-26 (accessed May 24, 2023).

[5] See America's Increasing Use of Life and Long-Term Sentences – The Sentencing Project, <https://www.sentencingproject.org/reports/still-life-americaos-increasing-use-of-life-and-long-term-sentences/>, p 5 (accessed May 24, 2023).

to defendants who are between the ages of 19 and 25 years old at the time of an offense, he is not entitled to have the trial court review his sentence because of his age at the time of the offense.

## IV. CONCLUSION

Defendant's conviction for second-degree murder is affirmed, his sentence of 200 to 400 years' imprisonment is vacated, and this matter is remanded for resentencing. We do not retain jurisdiction.

/s/ Jane E. Markey
/s/ Kathleen Jansen
/s/ Kirsten Frank Kelly